# United States Court of Appeals
## For the First Circuit

No. 17-2140

ERIN CAPRON; JEFFREY PENEDO; CULTURAL CARE, INC., d/b/a Cultural Care Au Pair,

Plaintiffs, Appellants,

v.

OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS; MAURA T. HEALEY, in her capacity as Attorney General of the Commonwealth of Massachusetts,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

Joan A. Lukey, with whom Justin J. Wolosz and Choate Hall & Stewart LLP were on brief, for appellants.
Ryan P. McManus, Donna A. Mizrahi, and Hemenway & Barnes LLP on brief for Host Families, amici curiae.
Faith Kalman Reyes and Verdi & Ogletree PLLC on brief for the Alliance for International Exchange, amicus curiae.
Michael Shih, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, Joseph H. Hunt, Assistant Attorney General, Andrew E. Lelling, United States Attorney, and Alisa B. Klein, Attorney, Appellate Staff, Civil Division, on brief for the United States, amicus curiae.
Robert E. Toone, Assistant Attorney General, with whom Maura

T. Healey, Attorney General of Massachusetts, and Elizabeth A. Kaplan, Assistant Attorney General, were on brief, for appellees.

Audrey R. Richardson, Greater Boston Legal Services, Catherine Fisher, Marley Brumme, Meredith B. Stewart, Gillian B. Gillers, Southern Poverty Law Center, Benjamin Richard Botts, Centro de los Derechos del Migrante, Inc., Rocío Alejandra Avila, and National Domestic Workers Alliance, on brief for Worker Organizations, amici curiae.

Dawn L. Smalls, Byron Pacheco, Sean P. Rodriguez, Juan P. Valdivieso, Boies Schiller Flexner LLP, David Seligman, and Towards Justice, on brief for Sarah Carolina Azuela Rascon and All Other Similarly Situated Current and Former Au Pairs, amici curiae.

---

December 2, 2019

---

**BARRON**, **Circuit Judge**. This appeal concerns the relationship between the wage and hour rights that Massachusetts confers on in-home childcare services providers and the operation of a federal program that promotes international cultural exchange. The United States Department of State ("DOS") administers this federal program, which we will refer to as the "Au Pair Program." Through it, foreign nationals may obtain a special type of visa and then be placed with host families in the United States, so that the foreign nationals may provide in-home childcare services to the host families while they also pursue their post-secondary school studies.

The issue that we must resolve in this appeal arises in connection with a lawsuit that was filed on August 31, 2016 in the United States District Court for the District of Massachusetts against the Attorney General of Massachusetts ("Attorney General"). The plaintiffs are Cultural Care, a DOS-approved private placement agency based in Massachusetts, as well as Erin Capron and Jeffrey Penedo, who each reside in Massachusetts and with whose families Cultural Care has in the past placed foreign national visa holders through the Au Pair Program.

The plaintiffs contend that the Au Pair Program impliedly preempts Massachusetts from requiring host families to comply with its wage and hour laws as employers of the visa holders

who provide them childcare services through that program. The plaintiffs seek declaratory and injunctive relief.

The Attorney General moved to dismiss the plaintiffs' complaint. The District Court granted the motion on August 1, 2017. The next day, the District Court ordered the plaintiffs' case dismissed. The District Court also denied the plaintiffs' motion for reconsideration of the order of dismissal or, in the alternative, for leave to amend the complaint.

The plaintiffs timely appealed both the order of dismissal and the denial of the motion for reconsideration or, in the alternative, for leave to amend the complaint. We now affirm.[1]

## I.

We first describe the relevant federal and state bodies of law. We start with the federal measures. We then turn to the state law measures.

## A.

The federal measures consist of authorizing legislation and implementing regulations. We consider each type of federal measure in turn.

---

[1] Our conclusion accords with the only other precedent to address the issue. See Beltran v. InterExchange, Inc., 176 F. Supp. 3d 1066, 1083–84 (D. Colo. 2016).

**1.**

Nearly sixty years ago, Congress enacted the Fulbright-Hays Act. See Pub. L. No. 87-256 § 102, 75 Stat. 527 (1961) (codified at 22 U.S.C. § 2452). That statute authorized a series of "educational" and "cultural exchanges." Id. The preamble to the statute describes Congress's purposes in authorizing these cultural exchanges as follows:

> [T]o enable the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange; to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interests, developments, and achievements of the people of the United States and other nations, and the contributions being made toward a peaceful and more fruitful life for people throughout the world; to promote international cooperation for educational and cultural advancement; and thus to assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world.

22 U.S.C. § 2451.

The Fulbright-Hays Act provided funding for a series of cultural exchange programs to bring foreign nationals to this country and also created the J-Visa. See Pub. L. No. 87-256 § 109 (codified at 8 U.S.C. § 1101(a)(15)(J)). The provision of the statute that creates the J-Visa states that, to qualify for it, a person must be:

an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program . . . for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills or receiving training.

8 U.S.C. § 1101(a)(15)(J).

The DOS is currently responsible for implementing the provisions of the Fulbright-Hays Act that we have just described. See 22 C.F.R. § 62.1. The DOS does so through regulations that govern different types of "exchange visitor programs." See id. §§ 62.3, 62.4; Exchange Visitor Program -- Au Pairs, 74 Fed. Reg. 15,844 (Apr. 8, 2009) (to be codified at 22 C.F.R. pt. 62). The "Exchange Visitor Program" regulations authorize the DOS to designate only certain types of exchange programs as "exchange visitor programs." See, e.g., 22 C.F.R. § 62.24(b) (authorizing designation of "exchange visitor programs in the Teacher category"); id. § 62.31 (authorizing designation of "au pair exchange program[s]").[2]

---

[2] The "participants" in a DOS-designated exchange visitor program are also called "exchange visitors" in the regulations. 22 C.F.R. §§ 62.1(b), 62.2 (defining "Exchange Visitors").

Participants in these "exchange visitor programs" can receive "J-1" visas. 8 C.F.R. § 214.1(a)(2) (designating visas provided pursuant to 8 U.S.C. § 1101(a)(15)(J) as "J-1" visas). A J-1 visa is a nonimmigrant visa that permits a foreign national to come to the United States for "teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training." 8 U.S.C. § 1101(a)(15)(J); 8 C.F.R. § 214.1(a)(2). Persons who possess J-1 visas "may be employed" in the United States only through "exchange visitor programs." 8 C.F.R. § 274a.12(b)(11).

The DOS "Exchange Visitor Program" regulations provide that exchange visitor programs are "conduct[ed]" by "sponsors[.]" 22 C.F.R. §§ 62.3, 62.31(c). The sponsors are private placement agencies, such as the one that is a plaintiff in this case: Cultural Care.

The "Exchange Visitor Program" regulations authorize the DOS to "designate" the private placement programs "conducted" by these sponsors as "exchange visitor programs." Id. §§ 62.3, 62.31 (a)-(c). The DOS's designation authorizes the sponsor to "select[]" foreign nationals to be "participants" in its exchange visitor program, which in turn permits the participants to be placed in employment settings in this country pursuant to their J-1 visas. See id. § 62.31(c)-(d).

Sponsors "must remain in compliance with all local, state, and federal laws, and professional requirements necessary to carry out the activities for which [they are] designated, including accreditation and licensure, if applicable." Id. § 62.9(c). Regardless of the nature of the DOS-designated exchange visitor program, the sponsor must, among other things, appoint "Responsible Officers." Id. § 62.11(a).

If the exchange visitor program has "an employment component," the "Responsible Officers" must have "a detailed knowledge of federal, state and local laws pertaining to employment." Id. Sponsors of exchange visitor programs that have an employment component must provide "clear information and materials" to program participants, including information on "employee rights and laws, including workman's compensation." Id. § 62.10(b)(9).

The DOS "Exchange Visitor Program" regulations do not purport to regulate directly those for whom the participants in these exchange visitor programs work after the sponsors have placed them in a job. See id. § 62.31. The regulations -- with limited exceptions not relevant here -- directly regulate only the sponsors themselves. Id. The only sanctions that the regulations set forth that the DOS may impose on a sponsor are for its failure to meet one of its obligations under the regulations. Those sanctions -- again, with limited exceptions not relevant here -- only concern

- 8 -

the ability of the sponsors to retain or renew the DOS's designation of the placement programs that they run as ones that qualify as "exchange visitor program[s]." Id. §§ 62.31(n), 62.50.

**2.**

The DOS's "Exchange Visitor Program" regulations contain subsections that "govern" each type of exchange visitor program that the regulations encompass. See §§ 62.20-.32. The program types include ones for summer workers, au pairs, academics, teachers, and camp counselors. See id. The section of the DOS "Exchange Visitor Program" regulations at issue governs exchange visitor programs for "au pair participants." Id. § 62.31(a). These programs are also known as "au pair exchange program[s]." Id. § 62.31(c).

In 1986, the United States Information Agency ("USIA"), which was -- until 1999 -- responsible for the implementation of the Fulbright-Hays Act, established au pair exchange programs on a two-year, pilot basis. See Exchange Visitor Program, 59 Fed. Reg. 64,296 (Dec. 14, 1994) (to be codified at 22 C.F.R. pt. 514) (describing the 1986 program); see also Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, §§ 1311-1314, 112 Stat. 2681, 2681-776 (codified at 22 U.S.C. §§ 6531-6533) (dissolving the USIA and transferring implementation of the Fulbright-Hays Act to DOS). This two-year pilot, the USIA later

observed, had "rather non-specific program guidelines."  See 59 Fed. Reg. at 64,296, 64,299 (describing the preexisting program).

After the two-year trial period ended, the USIA decided not to designate the au pair exchange programs permanently due to a concern that "the programs were outside the Agency's statutory authority to oversee educational and cultural exchange activities."  Id.  Nevertheless, because of the substantial interest in the program, Congress enacted "special legislation" to "obligat[e]" the USIA to continue the programs.  Id.  Congress also directed the United States General Accounting Office ("GAO") to examine them.  See U.S. Gov't Accountability Office, GAO-90-61, U.S. Information Agency: Inappropriate Uses of Educational and Cultural Exchange Visas 19 (1990).

A GAO report, issued in 1990, determined that the pilot au pair exchange programs were not consistent with the intent of the Fulbright-Hays Act.  Id.  The report questioned whether the au pair exchange programs were properly designated as employment or cultural programs -- and thus the report questioned which federal agency should run the programs.  Id.  The GAO report noted the concern expressed by the United States Department of Labor ("DOL") that the "au pair program violates the spirit of the J-visa statute" because "a 40-hour week constitutes full-time employment, and, as such . . . [t]hese [foreign] workers would normally have to receive certification from the [DOL] that enough qualified U.S.

workers were not available and that the wages and working conditions attached to job offers would not adversely affect similarly employed U.S. workers." Id. Thus, the GAO report concluded, "[a]s currently structured, au pair programs would normally be subject to [DOL] administrative review and certification." Id. at 20.

Notwithstanding the concerns raised in the GAO report, Congress directed the USIA, pursuant to a new statute, to continue to implement the au pair exchange programs "until [they] could be transferred to a more appropriate federal agency." 59 Fed. Reg. at 64,296-97; see Eisenhower Exchange Fellowship Act of 1990, Pub. L. No. 101-454, 104 Stat. 1063. In 1994, Congress passed the Technical Amendments to the State Basic Authorities Act, Public Law 103-415, which authorized the USIA "to promulgate regulations specifically governing the au pair programs." 59 Fed. Reg. at 64,297.

In 1994, the USIA promulgated interim final regulations "to govern the au pair programs [in ways that are] consistent with the provisions of the Fulbright-Hays Act." Id. Those interim final regulations established the first iteration of what we refer to as the "Au Pair Program." Id.

The 1994 interim final regulations stated that "[a]u pair programs permit foreign nationals to enter the United States for a period of one year for the purpose of residing with an

American host family while participating directly in the home life of the family and providing limited childcare services." Id. at 64,296. They also contained a provision entitled "Stipend and hours," which obliged sponsors to "require that au pair participants . . . are compensated" -- presumably by their host families, though the provision does not specify who must pay the participants for the childcare services that they provide -- "at a rate of not less than $155.00 per week." Id. at 64,300. The provision obliged sponsors to require that participants would receive weekly compensation at least equal to the wage due to them under the FLSA if the participants had provided the full amount of childcare services that they were permitted under the program to provide to their host family in a given week, regardless of whether the participants actually had done so. In this way, the provision ensured that compensation for the participants would comply with the FLSA in the event that the DOL would deem the participants "employees" within the meaning of that statute. Id. at 64,298 (amending 22 C.F.R. § 514.31, though 22 C.F.R. § 514.31 has since been redesignated).

In 1995, the USIA revised that provision to oblige sponsors to "require that au pair participants . . . [a]re compensated at a rate of not less than $115.00 per week." Exchange Visitor Program, 60 Fed. Reg. 8547, 8553 (Feb. 15, 1995) (to be codified at 22 C.F.R. pt. 514). Once again, the USIA did so in a

manner that was intended to ensure that participants would not be paid less than the FLSA-prescribed minimum wage for domestic workers who qualified as "employees."  Id. at 8551.

The USIA then revised this provision once more in 1997. The USIA did so this time in response, in part, to a formal determination by the DOL that au pair participants are "employees" within the meaning of the FLSA and thus that "au pair participants are covered under the provisions of the [FLSA] and therefore must receive federal minimum wage."  Exchange Visitor Program, 62 Fed. Reg. 34,632, 34,633 (Jun. 27, 1997) (to be codified at 22 C.F.R. pt. 514).

The USIA at that time revised the "Stipend and hours" provision to instead be titled "Wages and hours."  Id. at 34,634. That provision was also revised at that time to state that "[s]ponsors shall require that au pair participants . . . [a]re compensated at a weekly rate based upon 45 hours per week and paid in conformance with the requirements of the [FLSA] as interpreted and implemented by the [DOL]."  Id.[3]  Congress then permanently

---

[3] The plaintiffs assert that the District Court incorrectly "suggested that the federal government has [since] 'abandoned'" the formula establishing an au pair's minimum wage requirements set out in the 1997 regulations, which was a formula based on the federal minimum wage multiplied by a presumed 45-hour work week minus a  deduction for the costs of room and board.  But, the District Court merely accurately described how the text of the regulations had changed over time.

authorized the Au Pair Program.  See An Act to Provide Permanent Authority for the Administration of Au Pair Programs, Pub. L. No. 105-48, 111 Stat. 1165 (1997).

The DOS now promulgates the au pair exchange program regulations.  Compare id. with 22 C.F.R. § 62.31(j)(1).  The current DOS version of the regulations describes the "objectives" of this type of exchange visitor program as "afford[ing]" to "foreign nationals" the "opportunity to live with an American host family and participate directly in the home life of the host family" while providing "up to" 45 hours a week of childcare services to the host family and also pursuing a post-secondary education. 22 C.F.R. § 62.31(a)-(b).  The current version of these regulations also includes a "Wages and hours" provision that mirrors the one in the 1997 version of the USIA's au pair exchange program regulations.  That provision states: "Sponsors shall require that au pair participants [a]re compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the [FLSA] as interpreted and implemented by the [DOL.]"  Id. § 62.31(j)(1).

The current version of the regulations that govern au pair exchange programs authorizes the DOS to designate a "bona fide program[]" of this type as an "exchange visitor program" if it "satisf[ies]" the specified "objectives" and if the "sponsor" meets certain "eligibility" requirements, as well as the

- 14 -

regulations' "Wages and hours" requirements.  Id. § 62.31(b)-(c), (j).  Sponsors that fail to meet those requirements or that fail to "[e]nforce and monitor host family's compliance with the stipend and hours requirements" may face "immediate program revocation procedures."  Id. § 62.31(n).  The DOS au pair exchange program regulations do not provide that an au pair exchange program participant may enforce against a sponsor -- let alone against a host family -- the only sanctions that the regulations specify.  See generally id. § 62.31.

**3.**

The au pair exchange program regulations, through their "Wages and hours" provision, cross-reference the FLSA's "requirements."  22 C.F.R. § 62.31(j)(1).  We thus briefly review the obligations that the FLSA and the DOL's regulations that implement the FLSA impose on the employers of domestic workers, as those "requirements" serve as the reference point under the Au Pair Program for calculating the weekly compensation that sponsors must require that au pair participants receive.

Under the FLSA, "employer[s] shall pay to each of [their] employees" a minimum hourly wage that is currently set at $7.25 per hour.  29 U.S.C. § 206(a).  In 1974, Congress amended the FLSA so that it would apply to domestic workers and their employers.  Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55 (codified as amended in scattered sections of 29 U.S.C.).

This amendment imposed a new requirement on employers of domestic workers to pay the federally mandated minimum wage. Id. However, the amendments exempt live-in domestic workers from the provisions that require employers pay to employees time-and-a-half for overtime. See 29 U.S.C. § 213(b)(21).

In implementing these amendments in 1975, the DOL promulgated regulations that imposed certain recordkeeping obligations on employers of domestic workers and that permitted those employers to deduct the costs of the domestic worker's room and board from the domestic worker's pay. Extension to Domestic Service Employees, 40 Fed. Reg. 7404 (Feb. 20, 1975) (to be codified at 29 C.F.R. pt. 552). Employers were to calculate such deductions either by using a fixed credit that totaled $36 per week or by deducting their actual costs for room and board, provided that the employers kept records to support those itemized deductions. Id. at 7406. The current version of these DOL regulations permit employers of domestic workers to take deductions either by using a fixed credit amount that is tied to a percentage of the federal minimum wage or by deducting their actual, itemized costs, if the itemized deductions are supported by adequate records. 29 C.F.R. § 552.100(c)-(d).

The FLSA contains a savings clause. 29 U.S.C. § 218(a). It provides that "[n]o provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State

law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter."  Id.

## B.

We now turn to the state law measures.  Like the federal ones, they consist of a mix of statutory and regulatory provisions.

## 1.

We start with the Massachusetts Fair Wage Law.  It requires that all "employer[s]" pay a minimum wage set, as of January 1, 2019, at $12 per hour, except in certain circumstances that are not relevant here.  Mass. Gen. Laws ch. 151, § 1.  A different section of the Massachusetts Fair Wage Law requires that "employer[s]" pay "employee[s]" at a rate of time-and-a-half for all hours that the "employee[s]" work in a week beyond 40 hours. Id. § 1A.

## 2.

We next describe the Massachusetts Domestic Workers Bill of Rights Act ("DWBORA").  Enacted in 2014, it sets forth workplace protections -- including concerning wages and hours -- for "domestic workers."  2014 Mass. Acts ch. 148, § 3 (codified at Mass. Gen. Laws ch. 149, §§ 190-191).  The DWBORA defines "domestic worker[s]" to include, in relevant part, "individual[s] or employee[s]" providing "nanny services" and "other household services for members of households . . . in private homes."  Mass. Gen. Laws ch. 149, § 190(a).

The DWBORA also authorizes the Attorney General to promulgate regulations to implement its provisions, which the Attorney General has done. Id. § 190(o); see 940 Mass. Code Regs. 32.00-.06. We now describe the Attorney General regulations that are relevant to this appeal.

Whenever a domestic worker clocks more than 40 hours of "working time" in a given week, the Attorney General's regulations require that he or she be "compensated at the overtime rate for all hours worked over 40 per week pursuant to [the Massachusetts Fair Wage Law]." 940 Mass. Code Regs. 32.03(3). One of the regulations that implements the DWBORA defines "working time" as "[c]ompensable time that includes all time during which a domestic worker is required to be on the employer's premises or to be on duty." Id. 32.02. This definition also defines "working time" to include "meal periods, rest periods, and sleep periods unless . . . a domestic worker is free to leave the employer's premises and use the time for the domestic worker's sole use and benefit and is completely relieved of all work-related duties." Id. The regulation provides, however, that employers and domestic workers may enter into an advance written agreement that excludes "meal periods, rest periods, and sleep periods." Id.

Other regulations that implement the DWBORA concern the deductions that an employer may take from a domestic worker's wages for the costs of that domestic worker's food and lodging. These

regulations limit these deductions to $1.25 for breakfast, $2.25 for lunch, $2.25 for dinner, and to $35 per week for a single-occupancy room. Id. 32.03(5)(b)-(c). These deductions must be agreed to, in advance and in writing, by the domestic worker. Id. 32.03(5)(a).

Finally, the regulations that implement the DWBORA impose recordkeeping requirements on the employers of domestic workers. For example, the employers of domestic workers must keep and retain for a period of three years records concerning the domestic workers' wages and hours, the rate of their pay, the costs for their meals and lodging, and various workplace policies, such as benefits afforded, required notice of termination, and job responsibilities. See id. 32.04(2)-(3). In addition, the employers of domestic workers must keep time sheets that reflect the compensable working time of the domestic worker for each day over a two-week period and provide the domestic worker an opportunity to review and contest that accounting of hours. Id. 32.04(4).

**3.**

The parties agree that the Attorney General considers au pair exchange program participants to be "domestic workers" and their host families to be "employers" within the meaning of the DWBORA. The parties also agree that au pair participants are "employees" within the meaning of the Massachusetts Fair Wage Law.

The parties ask us to resolve two preliminary issues. They concern, respectively, the scope and the nature of the plaintiffs' preemption claims.

The "scope" issue arises because, although the complaint's prayer for relief does not mention the Massachusetts Fair Wage Law, the plaintiffs contend that their preemption claims -- and thus their request for injunctive and declaratory relief -- encompass that law. The Attorney General contends, however, that the plaintiffs' preemption challenge is confined to the DWBORA and its implementing regulations, because the prayer for relief set forth in the plaintiffs' complaint refers only to those specific state law measures. Our review of this issue is de novo. Carter v. Ford Motor Co., 561 F.3d 562, 565 (6th Cir. 2009).

"A plaintiff's failure to seek a remedy in its complaint does not necessarily forgo that remedy." Town of Portsmouth v. Lewis, 813 F.3d 54, 61 (1st Cir. 2016). Thus, "a district court need not dismiss a cause of action upon which relief is plausible, even if that relief was not sought in the complaint." Id.

The plaintiffs' complaint expressly alleges that the requirement that au pair participants comply with the Massachusetts minimum wage, as prescribed by the Massachusetts Fair Wage Law, "contradicts existing [DOS] requirements" about "the federal minimum wage, which [the DOS] has chosen to use in

calculating the amount of the [au pair's] weekly stipend." In addition, the District Court's opinion addressed whether the Massachusetts Fair Wage Law was preempted insofar as it applied to au pair participants. In fact, at each stage of this litigation, the Attorney General has argued that the Massachusetts Fair Wage Law's minimum wage requirement applies to au pair participants. Thus, there is no unfair surprise to the Attorney General in our consideration of whether the DOS regulations preempt the Massachusetts minimum wage that the Massachusetts Fair Wage Law generally establishes for those who qualify as "domestic workers" under the DWBORA, insofar as that minimum wage requirement applies to the host families as the employers of au pair participants. See Lewis, 813 F.3d at 61 (explaining that complaints should generally be read broadly, except when it would be likely to prejudice a defendant).

The "nature" issue arises because the plaintiffs contend that they need only establish that the challenged state "laws are invalid" as applied to the "Au Pair Program." The plaintiffs argue that they need not show that "no set of circumstances exists" under which the challenged laws would be valid in any application. Even though the plaintiffs' preemption challenges are facial in nature, we agree with the plaintiffs. See John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010) (explaining that the particular label of the claim -- facial versus as applied -- "is not what matters" and

- 21 -

that "[t]he important point" is that the plaintiffs must "satisfy our standards for a facial challenge to the extent of [the] reach" of their claims). In fact, we do not understand the defendants to contend otherwise or the District Court to have ruled otherwise.[4]

**III.**

We now turn to the heart of the dispute: are the state law measures at issue -- in whole or in part -- preempted, insofar as they protect au pair participants by imposing obligations on their host families as their employers that may be enforced against those host families?[5] The Supremacy Clause provides that federal

---

[4] This case does arise in the pre-enforcement context, but the preemption claims involve "purely legal questions, where the matter can be resolved solely on the basis of the state and federal statutes at issue," Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 327 (1st Cir. 2016)(quoting Wis. Cent., Ltd. v. Shannon, 539 F.3d 751, 759 (7th Cir. 2008)). There also is no question that Massachusetts intends to enforce the challenged state law measures to protect au pair participants insofar as they are denied the protection that those measures afford their employers. See id.

[5] The plaintiffs allege in their complaint that, in the spring of 2015, the Office of the Attorney General of Massachusetts ("OAG") "suggested that Sponsors should be considered non-exempt 'placement agencies' -- and therefore potentially also employers -- under the [DWBORA] and the MA regulations. The meeting terminated without clarity as to whether the MA OAG ultimately would, or would not, interpret the MA Act as applying to [Cultural Care]." The plaintiffs asked the District Court to conclude that the state law measures were preempted and could not be enforced against Cultural Care or Cultural Care's host families. In so doing, the plaintiffs did not develop an argument in support of those preemption claims that depends on the state law measures being enforced against Cultural Care, as a sponsor, and instead focused their argument on why the state law measures were preempted

law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  This Clause gives Congress "the power to preempt state law," which Congress may exercise either expressly or impliedly.  Arizona v. United States, 567 U.S. 387, 399 (2012). A federal agency, however, also may preempt state law through its regulations, and a federal agency, too, may do so either expressly

---

insofar as they could be enforced against the host families as employers of au pair participants. The District Court in rejecting the plaintiffs' preemption claims did not address, specifically, whether the DWBORA and its regulations -- or the state's minimum wage -- could be enforced against sponsors and not just the host families themselves.

On appeal, the plaintiffs refer to the "Au Pair Program" but, once again, do not develop an argument for preemption that depends on the application of the state law measures to sponsors rather than to host families.  Instead, in their briefing to us, the plaintiffs refer only to the obligations that the state law provisions at issue would impose on host families, in consequence of the childcare services that au pair participants provide to them through the Au Pair Program.  We thus do not have the distinct question before us on appeal whether the DWBORA and its implementing regulations or the Fair Wage Law, as applied to sponsors in particular, are preempted by the federal regulations that govern sponsors of au pair exchange visitor programs.  Nor is it clear that such a challenge to the enforceability of those measures against the sponsors would be ripe.  See Labor Relations Div., 844 F.3d at 327 (finding a preemption challenge unripe where the nature of and legal basis for the state law enforcement action was uncertain).  We emphasize, though, that it is clear that Cultural Care, even though it is a sponsor rather than a host family, would be directly impacted by an application of the relevant state law provisions to host families, in light of Cultural Care's allegations about the impact that such application to host families would have on Cultural Care's ability to find host families with which to place au pair participants and the host family plaintiffs' allegations about their intention to serve as host families in the future.

or impliedly.  See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982).

The plaintiffs assert only implied preemption.  There are two types -- field preemption and conflict preemption, which itself comes in two varieties:  obstacle preemption and impossibility preemption.  We begin with the plaintiffs' field preemption claim.  We then consider their conflict preemption claims, which concern only obstacle preemption.

The burden to prove preemption is on the plaintiffs. See United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 9 (1st Cir. 2005).  That is so even if the presumption against preemption that often applies to implied preemption claims does not apply here.  Lusnak v. Bank of Am., N.A., 883 F.3d 1185, 1191 (9th Cir.), cert. denied, 139 S. Ct. 567 (2018).

**A.**

States may not regulate "conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  Arizona, 567 U.S. at 399 (citing Gade v. Nat'l Solid Waste Mgmt. Ass'n, 505 U.S. 88, 115 (1992)(Souter, J. dissenting).  Thus, unlike conflict preemption, field preemption ousts state law measures even if no evidence shows that they would conflict with the federal regulatory scheme either by frustrating its purposes and objectives, see Hines v. Davidowitz, 312 U.S. 52, 67 (1941), or by imposing obligations

that it would be impossible for the regulated party to comply with and also comply with the obligations that the federal regulatory scheme imposes, see Wyeth v. Levine, 555 U.S. 555, 589-90 (2009). The federal government's intent to preempt a field instead "can be inferred from [1] a framework of regulation 'so pervasive . . . that'" it leaves "'no room for the States to supplement it' or [2] where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Arizona, 567 U.S. at 399 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

The plaintiffs contend that the detailed and comprehensive nature of the DOS au pair exchange program regulations warrants the inference that the DOS intended to exclusively govern a field of state regulation that encompasses the Massachusetts wage and hour measures, insofar as these measures may be enforced to protect the rights of au pair participants against their host families as their employers. The plaintiffs further contend the dominance of the federal interests that the Au Pair Program implicates -- namely, the federal foreign affairs interest in regulating immigration and the federal foreign

affairs interest in managing foreign relations -- supports this same inference.[6]

We review de novo the District Court's finding that there is no field preemption. See Bower v. Egyptair Airlines Co., 731 F.3d 85, 92 (1st Cir. 2013). We conclude that the District Court did not err in rejecting the plaintiffs' field preemption claim.

**1.**

In De Canas v. Bica, the United States Supreme Court considered a claim that "Congress, in enacting the [Immigration and Nationality Act ("INA")], intended to oust state authority to regulate" the employment of undocumented aliens "in a manner consistent with pertinent federal laws" due to the comprehensive and detailed nature of that federal statute. 424 U.S. 351, 357 (1976). The Court applied the presumption against preemption, see id. at 360-61, notwithstanding that the INA represented an exercise

---

[6] The plaintiffs also make a textual argument for finding field preemption based on the DOS "Exchange Visitor Program" regulations as a whole, which specifically require sponsors of certain other types of exchange visitor programs -- but not of au pair exchange programs -- to ensure that those who employ participants in those programs comply with state wage and hour laws. The plaintiffs contend that we thus must infer -- by negative implication -- that the DOS did intend to preempt a field that would encompass state wage and hour laws that protect au pair participants. As the plaintiffs make this same argument in a more developed fashion in support of their claim of obstacle preemption, see Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 n.6 (2000) ("[w]e recognize, of course, that the categories of preemption are not "rigidly distinct"), we explain our reasons for rejecting the argument in that portion of our opinion, see infra Section III.B.2.

of the federal government's power over immigration and thus implicated the federal government's power over foreign affairs, see id. at 353.

De Canas explained that the Court had "never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." Id. at 355. De Canas added that the state laws at issue were not deciding "who should or should not be admitted into the country and the conditions under which a legal entrant may remain," as they merely concerned the power to employ undocumented aliens already in the country. Id.

The Court also explained that the state law measures -- which regulated employment -- concerned a quintessentially local area of regulation. See id. at 356-57. This fact, the Court determined, also counseled against inferring that Congress intended to preempt the relevant field through the INA. Id.

With the presumption against preemption in place, the Court then held that "[t]he comprehensiveness" of the INA, "without more[,]" was not sufficient to establish the "clear and manifest" congressional intent to oust state law that is required to overcome the presumption against preemption. Id. at 357, 359. Accordingly, the Court rejected the claim of field preemption, id., concluding that the "nature and complexity" of the federal subject matter

made the "detailed statutory scheme . . . likely and appropriate, completely apart from any questions of pre-emptive intent," id. at 359-60 (quoting New York Dep't of Social Servs. v. Dublino, 413 U.S. 405, 415 (1973)).

The plaintiffs do not dispute that the presumption against preemption that De Canas applied would be especially difficult to overcome here.  The details of the federal program in this case are set forth in federal regulations, not a federal statute.  See Hillsborough Cty. v. Automated Med. Labs., Inc., 471 U.S. 707, 717-18 (1985) (justifying a reluctance to infer preemptive intent from the comprehensiveness of regulations based in part on the "variety of means, including regulations, preambles, interpretive statements, and responses to comments" through which an agency can "make their intentions clear if they intend for their regulations to be exclusive").

In fact, we do not understand the plaintiffs to argue that, insofar as the presumption against preemption does apply, their field preemption claim can succeed.  The plaintiffs contend, however, that the presumption against preemption on which De Canas relied does not apply.

The plaintiffs rely on Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 347 (2001), for that assertion.  They contend that the assertedly preemptive federal measures here operate in fields that are "inherently federal in character," id.,

- 28 -

foreign relations and immigration, and thus that, under Buckman, the presumption against field preemption that the Supreme Court applied in De Canas does not apply.  But, Buckman -- which concerned conflict, not field preemption, id. at 348 -- explained that the presumption against preemption did not apply there because the "federal enactments [were] a critical element" in the state law claim in that case.  See id. at 353.  The state employment laws that the plaintiffs seek to preempt here, however, are generally applicable to all domestic workers.  Thus, they are not predicated on the existence of the federal au pair exchange program regulations.  See Mass. Gen. Laws ch. 149, §§ 190-191; 940 Mass. Code Regs. 32.00 et seq.[7]

---

[7] The DOS, we note, in its amicus filing, invokes Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 314 (2d Cir. 2005), to argue that there is no presumption against preemption if federal authority has occupied the field "for an extended period of time." But, Wachovia, which concerned the preemptive effect of the federal regulation of national banks, did not purport to hold that the presumption against preemption has no application to a federal regulatory scheme merely because it implicates, in some manner, a "field[] of regulation that ha[s] been substantially occupied by federal authority for an extended period of time."  414 F.3d at 314 (citing Flagg v. Yonkers Sav. & Loan Ass'n, 396 F.3d 178, 183 (2d Cir. 2005)).  Nor, in light of De Canas, do we see how Wachovia could be read to stand for such a proposition.  We note, too, that Wachovia addresses the application of the presumption against preemption only in connection with the question of whether Congress intended to authorize the federal agency charged with regulating national banks to preempt state laws that purported to regulate such banks and not with respect to the question of whether the federal agency itself had intended to do so.  There was no dispute in that case -- as there plainly is here -- concerning the intent of the federal agency with respect to preemption.

Even if we were to agree that the presumption against field preemption does not apply, the plaintiffs would still bear the burden of proving that the Au Pair Program does preempt the relevant field. And, as we will next explain, we find unpersuasive the plaintiffs' arguments as to why there is affirmative evidence of a field preemptive intent here.

**2.**

The plaintiffs emphasize that the DOS regulations that establish the Au Pair Program are detailed and comprehensive. But, we do not see why, especially in light of the reasoning in De Canas, that fact alone justifies the inference that the federal government intended the Au Pair Program to preempt a field that would encompass the state law measures at issue. As in De Canas, we conclude that here, too, a "detailed [federal] scheme [is]. . . likely and appropriate, completely apart from any questions of pre-emptive intent." 424 U.S. at 360 (quoting Dublino, 413 U.S. at 415).

The regulations set forth detailed requirements that the DOS may enforce through sanctions. The regulations are directed at the sponsors, however, and the sanctions that the DOS may enforce apply to them, not the host families themselves. The sanctions also merely limit or end -- save for exceptions not relevant here -- the ability of the sponsors to continue to conduct DOS-approved au pair exchange programs. Thus, the DOS's decision

to promulgate detailed and comprehensive regulations, given that they govern and sanction sponsors, does not support an inference that the DOS thereby intended to oust state employment laws that define, as part of a generally applicable regulatory scheme, the rights and duties of au pair participants and host families with respect to each other in their employment relationship.  For, De Canas makes clear, the mere fact that a state law implicates the interests of persons who are the subject of federal regulation, even with respect to immigration, does not alone provide a basis for inferring that the federal regulatory scheme was intended to preempt a field that encompasses such a state law, at least when it concerns a matter of such quintessentially local concern as employment.  Cf. id. at 360-61, (explaining that federalism concerns "require[] us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the (federal regulation)" (quoting San Diego Unions v. Garmon, 359 U.S. 236, 243 (1959)) (second alteration in the original)).[8]

---

[8] In support of this aspect of their field preemption challenge, the plaintiffs also invoke the conclusion in ASSE Int'l, Inc. v. Kerry, 803 F.3d 1059, 1070–71 (9th Cir. 2015), that the Exchange Visitor Program regulations, generally, are "comprehensive."  That case does not address, however, the question of preemption.  Rather, it concerns only whether there was sufficient law to apply to permit review under the Administrative Procedure Act, 5 U.S.C. §§ 551, 706, of the DOS's compliance with those regulations. Furthermore, the Exchange Visitor Program

The plaintiffs also point to the fact that the Au Pair Program implicates the federal government's power over foreign affairs, both with respect to immigration and foreign relations. The plaintiffs contend that this feature of the Au Pair Program also requires us to presume an intent to preempt the relevant field. But, we do not agree.

Insofar as the Au Pair Program implicates the federal power over immigration, the Court's ruling in De Canas stands in the way of the plaintiffs' contention that, in consequence, we must presume an intent to preempt the relevant field. The Court made clear in De Canas that the fact that a state law applies to aliens does not alone justify a presumption that the federal government intended for the INA to preempt such a law. See id. at 355. Moreover, the state law employment measures at issue in De Canas applied only if the employees were undocumented aliens, see id. at 356, and thus, in that respect, more directly implicated the federal power to regulate immigration (and thus foreign affairs) than do the generally applicable state law wage and hour measures that are at issue here. In addition, these state law

---

regulations at issue in ASSE Int'l did not include those governing au pair participants. Moreover, consistent with our analysis, the Ninth Circuit pointedly observed there that "[f]or program sponsors, the regulations have the force of law, and there are real consequences for failing to abide by them." Id. at 1070-71 (emphasis added).

measures do not purport -- as the ones at issue in De Canas did, id. at 364, -- to preclude the foreign nationals affected by them from being employed. They merely establish the wage and hour rights that the foreign nationals affected by the federal regulatory scheme enjoy if they are employed.

The plaintiffs separately contend that, because the Au Pair Program implicates the distinct federal interest in promoting international cultural exchange, it implicates "a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Arizona, 567 U.S. at 399 (quoting Rice, 331 U.S. at 230). If the states were allowed "to apply their own laws to the Au Pair Program," the plaintiffs assert, then those states' laws "would inevitably interfere with the federal government's exclusive power to determine what regulations will best achieve its foreign relations goals."

But, the plaintiffs do not account for the disjuncture between the sponsor-based focus of the DOS regulations and the employment-based focus of the state law measures. Nor is there precedent that indicates that a federal program that represents an exercise of the federal power to manage foreign relations -- even if only through a program to promote international cultural exchange -- must be presumed, for that reason alone, to preempt a state law that merely implicates that power. See Am. Ins. Ass'n

v. <u>Garamendi</u>, 539 U.S. 396, 419 n.11 (2003) (explaining that, where a state is "act[ing] within . . . its 'traditional competence,'" it might well make sense to require some evidence of an actual <u>conflict</u> between the federal and state laws in order to find preemption on an implicit basis even when the federal law implicates the federal interest in foreign affairs (quoting <u>Zschernig</u> v. <u>Miller</u>, 389 U.S. 429, 459 (1968) (Harlan, J., concurring))).[9]

This case also is not one in which it would make sense to adopt such a pro-field-preemption presumption. The plaintiffs themselves emphasize that Congress intended for the Au Pair Program to "promote international cooperation" and to "assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world." 22 U.S.C. § 2451. It is hardly evident that a federal foreign affairs interest in creating a "friendly" and "cooperative" spirit with other nations is advanced by a program of cultural exchange that, by design, would authorize foreign nationals to be paid less

---

[9] The plaintiffs also point out that, although the au pair regulations require that au pair participants be between the ages of 18 and 26, Massachusetts age discrimination laws "prohibit age discrimination against any person over the age of 40." <u>See</u> 40 Mass. Gen. Laws ch. 149, § 24A. But, the fact that the federal scheme might conflict with, and thus preempt, specific sections of Massachusetts law unrelated to a domestic worker's wage and hour rights provides no support for the assertion that the entire field of state wage and hour laws is preempted with respect to their application to host families as employers of au pair participants.

than Americans performing similar work.  We thus conclude, like the District Court, that the plaintiffs have failed to meet their burden to show that the federal government intended to preempt a field that would encompass the state law measures that they challenge.

**B.**

We now consider the plaintiffs' conflict preemption claims, which concern only obstacle preemption.[10]  As we have noted, the burden to establish this form of preemption is on the plaintiffs, whether or not the presumption against preemption applies.

The notion that underlies obstacle preemption is that the federal government would want a federal measure to be preemptive of any state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of that federal measure,  Hines, 312 U.S. at 67; see also Geier v. Am. Honda Motor Co., 529 U.S. 861, 873 (2000).  Thus, the plaintiffs do not, as they did in arguing for field preemption, ask us to infer an intent on the part of the federal government to

---

[10]  The plaintiffs make no argument concerning the other variant of conflict preemption -- known as impossibility preemption -- because they do not dispute that it is possible for sponsors, au pair participants, and host families alike to comply with each of the state law measures at issue while also complying with each of the federal ones.

oust a whole field of state regulation merely from the detailed and comprehensive nature of the au pair exchange program regulations. Nor do they ask us to infer such an intent from the fact that the Au Pair Program implicates the federal foreign affairs power over immigration or foreign relations. Instead, they ask us to draw the requisite inference of an intent to oust the state wage and hour laws at issue from what they contend are the specific purposes and objectives that underlie that federal program.

The plaintiffs contend in that regard as follows. The plaintiffs argue that, to accomplish the underlying objective of promoting international cultural exchange, Congress and the DOS sought, in establishing the Au Pair Program, to: (1) encourage a diverse array of American families throughout the United States to host au pair participants, (2) encourage foreign nationals to seek out placements with host families in all parts of the country, and (3) ensure that the relationship between host families and au pair participants would be marked by true cultural exchange. The plaintiffs contend that it follows from these asserted underlying purposes and objectives that we must infer (1) that the DOS intended to set a uniform, nationwide ceiling on the obligations that could be imposed by states on host families with respect to the wage and hour rights of au pair participants; (2) that, in service of this end, the federal government intended to establish

a nationwide, uniform ceiling on the recordkeeping and administrative burdens that could be imposed on host families with respect to au pair participants who provide in-home childcare services to them; and (3) that the obligations set forth in the DOS au pair exchange program regulations on sponsors themselves constitute that ceiling.

The plaintiffs then tie up their argument for finding obstacle preemption this way. They contend that the enforcement of each of the challenged Massachusetts measures necessarily would frustrate the federal objective of establishing such a nationally uniform system of compensation. The enforcement of each such measure, they argue, necessarily would exceed the regulatory ceiling that the Au Pair Program established by imposing an independent and additional state obligation on host families not imposed by the Au Pair Program itself.[11]

---

[11] In setting forth this contention, the plaintiffs go into considerable detail about the claimed burdensome impact of these Massachusetts measures on host family obligations with respect to compensation, recordkeeping, and administration. But, we understand the plaintiffs to be pointing to these alleged burdens merely to provide support for the actual premise of their obstacle preemption claims: that the purpose of the DOS and Congress was to establish a nationally uniform compensation and hours ceiling -- pegged in substantial part to the minimum requirements of the FLSA -- that would preempt the wage and hour rights that states might confer on the au pair participants themselves to enforce against their host families. See infra Section III.B.3.a. We do not understand the plaintiffs to be making an argument that these particular state law measures may be deemed preemptive only because they are especially burdensome, such that other state wage and

We begin by reviewing the relevant precedents in this area and how they bear on the plaintiffs' argument that there should be no presumption against finding that the state law measures in this case would pose an obstacle to the accomplishment of the Au Pair Program's purposes and objectives. We then explain why, reviewing the issue de novo, see Bower, 731 F.3d at 92, we conclude that the plaintiffs have not met their burden to establish obstacle preemption here, even if the presumption against preemption does not apply.

**1.**

The plaintiffs contend, in essence, that the relevant DOS regulations set not only a federal regulatory floor on au pair participant wage and hour protections but also, implicitly, a federal regulatory ceiling that limits the wage and hour protections that states may provide to au pair participants. A similar floor-ceiling issue arises with some frequency in disputes over obstacle preemption. It often does so, however, in settings that do not implicate immigration or foreign relations. It thus often arises in settings in which the presumption against preemption -- and thus a presumption against construing the federal

_____

hour measures that would impose less burdensome but still independent and additional obligations on host families would not be preempted.

- 38 -

regulatory floor also to be a ceiling on state regulation-- more clearly applies.

Here, however, the plaintiffs contend that no such presumption against preemption applies, given the nature of the federal interests implicated by the Au Pair Program. The plaintiffs rely on Boyle v. United Technologies Corp., which they contend holds that the evidence of "[t]he conflict with federal policy need not be as sharp" when the federal government is operating in a field of unique federal interest, such as the plaintiffs contend that the fields of foreign relations and immigration implicated by the Au Pair Program are. 487 U.S. 500, 507 (1988). The plaintiffs further contend that, in the absence of such a presumption against preemption, we must conclude that the state law measures would frustrate the federal objective of establishing a nationally uniform compensation scheme for au pair participants.

But, even if Boyle could be read to suggest that the evidence of the ceiling-setting intention here need not be clear, the plaintiffs still bear the burden of demonstrating that there is a conflict between the state law measures and the Au Pair Program by showing that the former would frustrate the purposes and objectives of the latter. Moreover, the plaintiffs do not dispute that, to meet that burden, they must identify affirmative evidence that Congress or the DOS had a ceiling-setting -- and

- 39 -

thus obstacle-preemption-creating -- intent. See Arizona, 567 U.S. at 400, 414 (describing the presumption against preemption in a case involving preemption based on federal immigration law and finding one provision "likely would survive preemption -- at least absent some showing that it has other consequences that are adverse to federal law and its objectives").

As we will next explain, the plaintiffs' arguments about the text of the relevant federal statutes and the DOS regulations, as well as their underlying history, fails to identify the needed affirmative evidence. Thus, we conclude that a finding of the requisite ceiling-setting intent would necessarily rest on the kind of unfounded speculation about the federal government's implicit intentions that may not ground a finding of obstacle preemption. See Chamber of Commerce of U.S. v. Whiting, 563 U.S. 582, 607 (2011) (plurality opinion).[12]

---

[12] We note that two relatively recent cases, Geier, 529 U.S. 861, and Williamson v. Mazda Motor of Am., Inc., 562 U.S. 323 (2011), wholly apart from their apparent reliance on the presumption against preemption, are instructive in fleshing out the kind of inquiry that courts must undertake to determine whether a federal agency regulation that clearly sets a regulatory floor for private conduct should nonetheless be construed to have impliedly also set a federal regulatory ceiling for the regulation of that private conduct by the states. In Geier, for example, the Court found that, in requiring automobile manufacturers to install passive restraints, such as airbags, in their vehicles, the United States Department of Transportation ("DOT") had deliberately provided the manufacturers with a range of choices to encourage technological development. Geier, 529 U.S. at 874-79. Thus, the Court found that the DOT had impliedly established not only a choice-

**2.**

We have already explained why the federal statutory provisions that authorize the Au Pair Program do not, by terms, demonstrate that the federal government impliedly intended to establish a nationally uniform compensation scheme. See supra Section III.A.2. Nor do the plaintiffs develop an argument that those provisions themselves, independent of the DOS regulations that implement the Au Pair Program, show that the federal government intended to establish the kind of ceiling that would create the conflict that would warrant a finding of obstacle

---

restricting regulatory floor on the manufacturers, but also a choice-preserving regulatory ceiling on what states could mandate manufacturers must do with respect to installing passive restraints. Id. Therefore, the Court held, a state tort law that imposed a duty on the manufacturers to install a specific type of passive restraint was preempted because its enforcement would frustrate the implicit federal objective of preserving the choice of manufacturers to comply with the federal regulation by a means other than the installation of that type of passive restraint. Id. at 882.

In Williamson, which concerned a related DOT regulation, however, the Court came to the opposite conclusion. There, the DOT's seatbelt regulation once again left manufacturers with a choice -- this time as to what type of seatbelt to install. Moreover, as in Geier, the state law at issue "would restrict that choice" by requiring additional safety measures. Williamson, 562 U.S. at 332. But, Williamson ruled that, because the DOT, in the federal regulation at issue, was concerned only with safety and not with providing manufacturers with a choice as to what seatbelt to install, the state law requirement under review was not preempted. Id. Moreover, Williamson explained, although the state law requirement that was being challenged would impose costs on the manufacturers above those that they would incur by complying with the federal regulation's floor, that fact alone provided no basis for finding a preemption-creating conflict between state and federal law. Id. at 335.

preemption. We thus follow the parties in focusing our attention on the DOS regulations that define the parameters of the Au Pair Program. See CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993).

To show the requisite ceiling-setting intent, the plaintiffs focus chiefly on the provision of the au pair exchange program regulations that is entitled "Wages and hours." 22 C.F.R. § 62.31(j). The provision states: "Sponsors shall require that au pair participants: (1) Are compensated at a weekly rate based upon 45 hours of child care services per week and paid in conformance with the requirements of the [FLSA] as interpreted and implemented by the [DOL]." Id. That provision further states, with respect to hours, that sponsors "shall require" that "au pair participants . . . do not provide more than 10 hours of child care per day, or more than 45 hours of child care in any one week." Id. §62.31(j)(2).

The plaintiffs emphasize that the provision sets the amount of compensation that sponsors shall require that au pair participants receive each week. It sets that amount, the plaintiffs note, on the assumption that au pair participants will provide the full 45 hours of childcare services a week that the Au Pair Program permits them to provide, regardless of whether the au pair participants provide it. The plaintiffs contend that the provision in this way reveals that the DOS intended to establish

a compensation system that is not intended to pay au pair participants for the actual number of hours that they work. It is proper to infer, the plaintiffs thus argue, that the DOS did not intend for au pair participants to be able to require their host families to pay them the minimum wage that a state might require for each actual hour of work, if the resulting wage for the week would exceed the weekly compensation amount set forth in the DOS regulations themselves for 45 hours of such work. Rather, the plaintiffs assert, the text of this provision shows, albeit implicitly, that the DOS intended to set an independent, nationally uniform compensation scheme that would preempt a more generous one that a state might establish, even if the state law scheme took the form of a generally applicable wage and hour law.

But, the text of this provision imposes the obligation to require that au pair participants receive a certain amount of weekly compensation only on the sponsors. No obligation, enforced by the DOS, is imposed on the host families themselves. The obligation that DOS may enforce against the sponsors is defined, moreover, in terms that make it hard to draw the ceiling-setting inference that the plaintiffs ask us to make.

An au pair participant is clearly paid "in conformance with" the FLSA minimum wage for a domestic worker who provides 45 hours a week in childcare services, so long as that participant receives <u>not less than</u> that minimum amount of weekly compensation.

Indeed, the plaintiffs concede that this text does not forbid au pair participants from being paid more. Thus, the plaintiffs acknowledge, for example, that, in accord with this provision, a host family may voluntarily pay an au pair participant more than the minimum wage required by the FLSA for that amount of work without creating any conflict with this provision. But, if a sponsor would meet its obligation -- which is the obligation that the regulations empower the DOS to enforce -- in the event a host family chooses to be that generous, then we fail to see what in the provision's text indicates that a host family may not be required to pay that higher wage in order to comply with a state wage and hour law. After all, a sponsor would be no less able to fulfill its obligation to ensure that au pair participants are paid "in conformance with" the FLSA -- given that it merely sets a non-preemptive floor -- in that circumstance.[13]

---

[13] We note, too, that the current "Wage and hour" provision replaced the "Stipend and hours" provisions of the 1994 and 1995 regulations. See supra Section I.A.2. Each of those prior versions of the au pair exchange program regulations, respectively, obliged sponsors to require that au pair participants "are compensated not less than" $155 or $115. 59 Fed. Reg. at 64,300; 60 Fed. Reg. at 8553 (emphasis added). That "not less than" formulation sounds in floor-setting, not ceiling-setting, terms. 59 Fed. Reg. at 64,300; 60 Fed. Reg. at 8553. Yet, the plaintiffs do not contend that the agency later meant to shift course when it changed the language to oblige sponsors to require that au pair participants received compensation pegged to a calculation based on "conformance with"

The au pair exchange program regulations do contain a section that purports to describe the "objectives" of the Au Pair Program. See 22 C.F.R. § 62.31(a)-(b). But, this provision does not refer to a federal governmental interest in setting a uniform national standard for either au pair participant wages or for host family recordkeeping requirements. Id. Nor do the plaintiffs contend otherwise, as they do not argue that the "objectives" provision itself supports their position about what the implicit objectives of the Au Pair Program are.

The "objectives" section does state that "[a]u pair participants provide up to forty-five hours of child care services per week and pursue not less than six semester hours of academic credit . . . during their year of program participation." Id. § 62.31(a). But, neither the "objectives" section nor any other provision of the DOS regulations refers -- at least in any express way -- to an agency interest in capping, based on the FLSA minimum wage, the costs of a host family that chooses to have an au pair participant provide the full amount of childcare services that the Au Pair Program allows. Nor do the Au Pair Program regulations reference state wage and hour laws, which is not surprising given the lack of any indication that the agency anticipated at the time

---

the FLSA's "requirements" rather than to a fixed, minimum dollar amount.

- 45 -

of the regulations' promulgation that state wage and hour laws would apply to domestic workers.  See infra Section III.B.3.a. Thus, the fact that a state wage and hour law might increase host family costs beyond what they would be in the absence of such a law is not, in and of itself, evidence that demonstrates that such a law would impede the accomplishment of the federal objective reflected in the text of the DOS regulations.  Cf. Williamson, 562 U.S. at 332.

From all one can tell from the text of these provisions, in other words, the Au Pair Program operates parallel to, rather than in place of, state employment laws that concern wages and hours and that protect domestic workers generally, at least with respect to the obligations that such state law wage and hour measures impose on host families to do more than what the FLSA itself requires.  Thus, the text of au pair exchange program regulations themselves does not supply the affirmative evidence that the state measures at issue will frustrate the federal scheme's objectives that the plaintiffs need to identify if they are to meet their burden to show obstacle preemption.

The plaintiffs ask us, however, to consider the Au Pair Program in light of the DOS "Exchange Visitor Program" Regulations as a whole.  They point out that the regulations that govern certain other exchange visitor programs expressly require sponsors to ensure that program participants are paid "the higher of . . .

[t]he applicable Federal, State or Local Minimum Wage," 22 C.F.R. § 62.32(i)(1)(i).[14]  They note that, by contrast, the section of the "Exchange Visitor Program" regulations that governs the au pair exchange programs does not.  See id. § 62.31(j).  The plaintiffs contend that this relative silence gives rise to an inference of a ceiling-setting intent on the part of the DOS by negative implication.

But, these other regulatory measures are themselves sponsor focused, and the plaintiffs do not suggest that, just because sponsors must ensure that the participants in those programs must comply with those state laws, those participants are barred from enforcing those state laws directly against their employers, insofar as their employers fail to comply with them.[15] In addition, the regulatory provisions that impose the obligation

_____

[14]  The summer work-travel regulations, 22 C.F.R. § 62.32(i)(1)(i), the teacher program, id. § 62.24(f)(5), and the camp counselor program, id. § 62.30(f), include references to the applicability of state and local wage laws or state that exchange visitors should be paid like their American counterparts.

[15] Consistent with this conclusion, the plaintiffs do not dispute that au pair participants are "employees" under the FLSA, as the DOL determined them to be in 1997 and as the au pair exchange program regulations have long accepted.  62 Fed. Reg. at 34,633. Nor do the plaintiffs appear to dispute that, if an au pair participant could show that she had worked a given number of hours in a week, then she would appear to have the independent statutory right as an "employee" under the FLSA to seek compensation for that amount of work from her host family as her "employer" if she had not in fact been paid the required wage.  The plaintiffs appear to accept this fact, moreover, notwithstanding that the Au Pair Program itself does not confer that right on the participants.

on the sponsors of those other programs are silent with respect to whether the DOS understood that the participants in them would be preempted from enforcing state wage and hour laws against their employers unless their sponsors were obliged to ensure that those employers complied with those laws. See, e.g., Exchange Visitor Program -- Summer Work Travel, 76 Fed. Reg. 23,177, 23,177-78 (Apr. 26, 2011) (to be codified at 22 C.F.R. pt. 62). In consequence, the fact that the DOS did not impose that same obligation on Au Pair Program sponsors does not show by negative implication that the DOS must have intended for the Au Pair Program to impose such a preemptive bar.

There is, moreover, textual evidence in other provisions of the DOS "Exchange Visitor Program" regulations that appears to be at odds with the inference that the plaintiffs ask us to draw from the relative silence of the regulations that govern the Au Pair Program. The plaintiffs do not dispute that au pair participants are "employees" within the meaning of the FLSA. The plaintiffs thus appear to accept that the Au Pair Program does have an "employment component[.]" Id. § 62.11(a). The general provisions of the "Exchange Visitor Program" regulations, however, expressly contemplate that state laws that regulate employment -- and thus that regulate an employee's wages and hours -- will independently protect participants in exchange visitor programs that have an "employment component." Id.; see id. § 62.10(b)(9)

(providing that sponsors must also provide "clear information and materials" to program participants, including information pertaining to "employee rights and laws, including workman's compensation").

The plaintiffs' only response is that, at least with respect to participants in the au pair exchange program, this general "employment component" provision must be referring merely to employee rights and laws other than state wage and hour laws. But, the ordinary meaning of the phrase "pertaining to employment," see id. § 62.11(a), would not appear to exclude wages and hour laws. The provision also applies, by terms, to any exchange visitor program with an "employment component." The plain text of the "employment component" provision thus provides no support for reading in the plaintiffs' preferred implicit limitation -- let alone for reading in that au-pair-exchange-program-based limitation and then also drawing the negative inference from relative silence that the plaintiffs ask us to draw.

Such a limitation on that "employment component" provision also is not compelled by the fact that sponsors of some exchange visitor programs must ensure that employers comply with state wage and hour laws. It would be odd to construe the more onerous directive that requires sponsors of certain visitor exchange programs to ensure employer compliance with state wage and hour laws to limit the scope of the less onerous directive

that requires all sponsors merely to have detailed knowledge of such laws and to convey information about them to program participants.  Per the regulations, moreover, sponsors clearly must have detailed knowledge of some state employment laws -- including concerning workman's compensation -- that the regulations do not require them to ensure that employers follow. See id. §§ 62.11, 62.10(b)(9).

We do not mean to challenge the plaintiffs' assertion that the au pair exchange program regulations do not themselves oblige sponsors (let alone host families) to require that au pair participants receive the minimum wage that a state would require that they be paid.  The regulations plainly do not.  But, the fact that the regulations do not themselves impose on host families an obligation to comply with state wage and hour laws that the DOS may enforce against them does not supply the needed affirmative evidence that the regulations were intended to preempt the enforcement of such a state law obligation against those families.

Finally, we find it significant that, although the DOS's au pair exchange program regulations make no reference to state wage and hour laws, they do refer to the expressly non-preemptive FLSA.  It is conspicuous -- insofar as the DOS is said to have the asserted preemptive intent -- that, in cross-referencing the FLSA's expressly non-preemptive requirements, the provision says nothing similarly express to indicate that the au pair exchange

program regulations preempt independently conferred wage and hour rights that the FLSA does not itself preempt.

In sum, the text of the au pair exchange program regulations and the "Exchange Visitor Program" regulations more generally do not supply the requisite affirmative evidence that the state law measures would pose an obstacle to the accomplishment of the purposes and objectives of the Au Pair Program. In fact, the text of the regulations reflects the DOS's intention to ensure that the regulations would accommodate the DOL's determination that au pair participants <u>are</u> employees who are entitled to be protected by an independent wage and hour law that is not itself preemptive. The regulations also reflect the fact that the DOS contemplated that state employment laws would protect exchange visitor program participants from their employers. Thus, if there is a basis for concluding that the relevant DOS provisions preempt wage and hour laws that the FLSA does not itself preempt, that conclusion must find support somewhere other than in the text of the DOS regulations themselves.

**3.**

The plaintiffs argue that the regulatory history lends the necessary support that, as we have explained, the regulatory text fails to supply. The plaintiffs point specifically, however, only to a few brief passages from the agency commentary that accompanied the 1994 and 1995 precursors to the current section of

the DOS regulations, which at the time had been promulgated by the USIA.  We do not disagree that this history may be relevant to our inquiry into agency intent.  See Geier, 529 U.S. at 884-85 (finding regulations to have a preemptive effect without clear text to that effect based on the regulatory history).  But, we conclude that, when considered in context, that history does not provide the affirmative evidence that the plaintiffs must identify to meet their burden to show obstacle preemption.

**a.**

The plaintiffs first point to a passage from the commentary that accompanies the USIA's 1994 Interim Final au pair exchange program regulations.  That passage refers to the need for there to be "uniform compensation" for au pair participants.  59 Fed. Reg. at 64,298.  The plaintiffs contend that this reference shows, quite clearly, that the agency did intend to establish the nationally uniform compensation system on which their obstacle preemption claims are premised.  But, the context shows otherwise.

The agency commentary indicates that a central concern for the agency at that time was whether "an employer/employee relationship [was] established between the au pair and the host family" -- and thus whether the FLSA applied to that relationship. See id.  The commentary shows that the agency thought that the au pair-host family relationship presented an analogous relationship to that of domestic workers and their employers under the FLSA.

- 52 -

The commentary further shows that the agency was inclined to "defer[] to more appropriate authorities" as to the nature of that relationship rather than to make its own independent judgment. Id. Nevertheless, the commentary goes on to explain, the agency had decided to base the weekly "Stipend" amount that sponsors would have to ensure that au pair participants received on the FLSA's wage and hour requirements for live-in domestic workers, assuming the au pair participants provided 45 hours of childcare services in that week, as if those FLSA requirements did apply of their own accord. See id. at 64,298-300.

It is at this point in the commentary that the reference to "uniform compensation" appears. The reference arose because, even after having decided to peg the stipend to an amount that would ensure compliance with the FLSA's floor -- insofar as the FLSA turned out to govern of its own force the au pair participant-host family relationship -- the agency still faced a choice. The agency needed to determine how high to set that FLSA-compliant weekly compensation amount.

The USIA noted in the accompanying commentary that this choice arose due to a DOL rule that implemented the 1975 FLSA amendments that governed domestic workers. Id. at 64,298. That DOL rule permitted employers of live-in domestic workers to deduct from those workers' wages either a fixed credit in the amount of $36 per week for their room and board costs or their actual room

and board costs on an itemized basis, so long as employers who chose the latter option kept records to support those itemized deductions. 40 Fed. Reg. at 7406 (DOL regulation setting maximum deductions).

Given that DOL rule, if the agency pegged the weekly stipend amount to a wage due a domestic worker for 45 hours of labor under the FLSA that was based on the $36 fixed credit that the DOL permitted employers to take, then the resulting compensation amount -- to be FLSA compliant -- would have to be a fixed and thus uniform dollar amount for every family of at least -- "not less than" -- $155 a week. 59 Fed. Reg. at 64,298. But, if the agency instead pegged the amount to the itemized deductions that host families were permitted to claim under the DOL's implementing regulations, then that amount (though still FLSA-compliant) would not only potentially be much lower, it also would, necessarily, not be uniform across families. For, in that event, that amount necessarily could vary from family to family (even within a state) with the amount of the legitimate itemized deductions that each host family might choose to claim. Id.

The USIA, having considered both approaches, explained in the commentary that it had decided to "adopt[] the $36 credit approach . . . in order to ensure that all au pair participants receive uniform compensation." Id. Thus, the context for the

reference to "uniform compensation" on which the plaintiffs rely shows the following.

The USIA made the reference to its interest in uniform compensation only in the course of attempting to explain why, having decided to peg the weekly compensation amount that sponsors would have to ensure to an amount that would "not [be] less than" the FLSA floor, it had chosen as between two possible FLSA-compliant amounts the one that was uniform (because pegged to the fixed credit) rather than the one that was variable (because, pegged to the itemized option). Accordingly, the reference to "uniform compensation" does not provide the needed affirmative evidence that the agency had an independent interest in ensuring the kind of nationwide uniformity in au pair participant compensation that would necessitate the imposition of a ceiling on the compensation that host families could be required by a state to pay an au pair participant.

In fact, no mention is even made of any state wage and hour laws, even though there is extensive discussion in the agency commentary of the expressly floor-setting -- rather than ceiling-setting -- FLSA. Nor is the absence of any such reference so surprising that we must assume that the agency failed to mention such state wage and hour measures only because it understood that they would be preempted.

The regulations then -- just like the DOS regulations now -- purported only to define the obligations of the sponsors of au pair exchange programs. It is hard to leap from the fact that a sponsor was not obliged to ensure that host families comply with those wage and hour laws to the conclusion that host families themselves were not obliged to do so, such that au pair employee participants could not enforce the rights that they otherwise would have under such laws against their host family employers. In fact, it is not clear that the agency was even aware at the time that state wage and hour laws protected the rights of domestic workers. Against that uncertain state law landscape, it would have made sense for the agency to have been concerned only with defining the sponsors' obligation as to the federal minimum wage, which the accompanying agency commentary makes clear that the agency was aware at the time might protect au pair participants.

**b.**

The plaintiffs' other evidence from the regulatory history comes from the commentary that accompanies the 1995 revisions to the Au Pair Program regulations. The plaintiffs point, first, to a portion of this commentary in which the agency states: "the programmatic need for a uniform wage remains." 60 Fed. Reg. at 8551. The plaintiffs then point to a portion of the commentary in which the agency describes a possible future revision by the DOL of its domestic worker regulations concerning room-and-

board costs deductions by employers of domestic workers. Id. That portion notes that, once made, that revision would "eliminate the need for host families to keep individualized records." Id. But, when considered in context, these passages do not provide the basis for drawing the inference with respect to obstacle preemption that the text of the regulations themselves fail to supply.

With respect to the agency's statement that "the programmatic need for a uniform wage remains," the context shows that host families had contended that the $155 stipend amount in the 1994 regulations was too high. Id. The host families were of that view because they contended that, in using the $36 fixed credit to generate the $155 amount, the USIA was relying on an outdated -- and thus artificially low -- means of estimating the actual room and board costs of host families as of 1995. Id. The host families thus had argued that the agency should permit host families to deduct their actual room and board costs on an itemized basis, as was permitted by that same DOL regulation, in order to account for inflation over the last decades. Id.

The agency found this contention persuasive, in part, but then added: "however, the programmatic need for a uniform wage remains." Id. For that reason, the agency opted for a new stipend amount -- $115 a week -- that would be lower than the prior one but still tied to a fixed dollar amount rather than to one that would vary with a particular host family's itemized deductions.

Id.  That revised approach would permit host families to claim itemized deductions but only up to an amount $40 greater than the $36 fixed credit amount, assuming that host families documented the up-to-$40-worth of itemized deductions with the records that the DOL rule required for deductions claimed on such an itemized basis.  Id.

Thus, once again, the passage that refers to uniformity as an agency interest appears in a specific context.  That context reveals that the reference to uniformity reflects the agency's continued interest in setting the compensation amount that sponsors would be required to ensure was paid at an amount at least equal to the FLSA minimum but still uniform for all host families (because pegged to a fixed dollar amount greater than the FLSA's $36 fixed credit deduction option) rather than as low as the FLSA minimum but potentially variable, even within a state, as to each host family (because pegged to the FLSA's itemized deductions option).  In context, then, the reference does not concern the distinct issue on which the obstacle preemption inquiry turns: whether the federal agency, in establishing this uniform floor for the amount that a sponsor must ensure that an au pair participant is compensated, intended also to set a nationally uniform wage ceiling, to ensure uniformity across states, that would preclude au pair participants from enforcing state wage and hour laws against their host families.

The commentary also supplies important context for the reference to the elimination of recordkeeping burdens that appears in the accompanying agency commentary to this iteration of the USIA regulations. The agency explained in that commentary that it set the new stipend amount $40 lower than it had set it in the 1994 interim final regulations. The agency explained that it had done so because the DOL had by then proposed a domestic worker regulation that would raise the cap on the fixed credit that employers of domestic workers could claim for room and board costs to an as-yet unknown amount. Id. Thus, the agency explained, the DOL's proposed revision to its domestic worker rule would -- once finalized -- substantially increase the fixed credit amount while still providing an option for claiming itemized deductions for room and board costs if supported by adequate records.[16] Id.; see

---

[16] We note that the regulatory history references a "programmatic need for a uniform wage." 60 Fed. Reg. at 8551 (emphasis added). It appears that the "programmatic need" for uniformity was a need that the agency was attributing to the privately conducted "programs," rather than to the agency itself, presumably because the "programs" had an interest in opposing itemized deductions. A duty to ensure that au pair participants received a fixed-dollar-amount-based stipend each week, after all, is more easily satisfied than is a duty to ensure that the participants receive a stipend amount from their host families that would depend on the legitimacy of the itemized deductions that individual host families claimed. See id. This understanding comports with the agency's explanation that, in the end, it chose to balance the "programmatic need" for uniformity with the needs of host families, who favored a variable stipend based on itemized deductions. Id. In this way, too, then, the passage from the agency commentary on which the plaintiffs rely appears to provide

also Application of the Fair Labor Standards Act to Domestic Service, 58 Fed. Reg. 69,310 (Dec. 30, 1993) (to be codified at 29 C.F.R. pt. 552) (proposed DOL rule permitting a fixed credit amount tied to the federal hourly minimum wage and deduction of actual costs supported by adequate records). The agency then noted that, once the DOL did so revise that fixed credit cap, the need for host families to keep records to claim deductions above the $36 fixed credit would thereby be eliminated. Id.

Given this context, the reference to the elimination of the need to undertake recordkeeping burdens fails to indicate that the agency intended to eliminate the imposition of independently imposed recordkeeping burdens on host families. In fact, as we have explained, the 1995 regulations affirmatively permitted host families to claim some itemized deductions under the DOL domestic workers rule in a way that the 1994 interim final regulations -- due to the higher compensation floor that had been set -- did not. But, the 1995 regulations permitted families to claim the itemized deductions without suggesting that, in doing so, they would not have to comply with the recordkeeping requirements for taking such itemized deductions that the DOL regulation imposed of its own

little support for concluding that the agency's interest in uniformity reflected an interest in establishing a nationally uniform compensation ceiling applicable in every state rather than merely a compensation floor that would not depend on the deductions claimed by particular families within any state.

accord. 40 Fed. Reg. at 7406 (1975 DOL regulations); Administrative Changes, 44 Fed. Reg. 6715 (Feb. 2, 1979) (to be codified at 29 C.F.R. pt. 552) (1979 amendments). To the contrary, the agency noted that this approach "will ensure adherence to federal law," 60 Fed. Reg. at 8551, which further reflects the agency's understanding that the FLSA's (non-preemptive) minimum wage and attendant recordkeeping requirements would apply as independent legal obligations to which host families may be subject separate and apart from any obligation that the USIA's au pair exchange program regulations imposed on them.

Moreover, as we shall next see, the agency ultimately opted to require sponsors to ensure that au pair participants received weekly compensation based on a calculation that would be "in conformance with the requirements of" the FLSA. 22 C.F.R. § 62.31(j)(1); 62 Fed. Reg. at 34,634. Significantly, the agency did so at a time when those FLSA "requirements" contemplated that employers could deduct from the wages of domestic workers the actual costs of room and board on an itemized basis only if such deductions were backed up with adequate supporting records. See 29 C.F.R. § 552.100(c)-(d); Application of the Fair Labor Standards Act to Domestic Service, 60 Fed. Reg. 46,766, 46,768 (Sept. 8, 1995) (to be codified at 29 C.F.R. pt. 552).

It is worth noting, too, that, in the commentary accompanying the 1995 regulations, the USIA explained for the first

time that it had been "specifically advised" by the DOL that au pairs were "employees" of their host families and thus subject to the FLSA. 60 Fed. Reg. at 8550. The USIA also explained in that same commentary that it would defer to the DOL on that issue. Id. Yet, in providing the DOL's analysis that supported that conclusion, the USIA did not refer to any potential conflict between the imposition of the FLSA's obligations on host families and any USIA interest, such as the goal of cultural exchange. See id. at 8550-51. Nor did the USIA express reservations about the DOL's characterization of the au pair participant-host family relationship as an employee-employer relationship. Nor, finally, did the USIA assert that, even though the FLSA's requirements are not preemptive of state wage and hour laws, the USIA's regulations keyed to those very same requirements were. See id.

If anything, then, the accompanying agency commentary indicates that the regulations were crafted to accommodate the fact that an independent wage and hour law -- the FLSA -- might treat the relationship between au pair participant and host family to be one between employee and employer and thus give independent rights to the former that could be enforced against the latter. But, that independent federal wage and hour law itself sets only a floor for the compensation and record keeping requirements that states may exceed through their own wage and hour laws. It is thus hard to see how either the USIA's 1995 au pair exchange

program regulations or the agency commentary to them provides the requisite support for the conclusion that the agency must have implicitly intended to establish a preemptive ceiling on wage and hour requirements that no state could exceed; no such state law measures were even mentioned in either the regulations themselves or the accompanying agency commentary. It is especially hard to see how those materials provide such support, insofar as the state law obligations would be imposed on host families as the employers of au pair participants, given that the regulations, by their terms, purported to impose obligations that the DOS could enforce only on the sponsors.

## c.

The one last piece of the regulatory history that the parties discuss -- the USIA's 1997 revision to the au pair exchange program regulations -- supports the same conclusion. That revision introduced, for the first time, the language on au pair participant compensation that appears in the current version of the DOS's au pair exchange program regulations. See 60 Fed. Reg. at 46,768.

The language refers to such compensation as a "wage" -- and thus calls to mind an employment relation -- and pegs the amount not to a fixed-dollar number but to a calculation based on the "requirements" of the FLSA, which, of course, are themselves expressly not preemptive. Id. The USIA explained in the commentary to the 1997 version of the regulations that accompany

these provisions, moreover, that, as of that time, the DOL had "determin[ed]" that au pair participants were "employees" under the FLSA and thus that they "must" be compensated in accordance with its terms.  62 Fed. Reg. at 34,633.  The 1997 commentary goes on to explain that the USIA had thus decided -- as it had long suggested that it would -- to defer to the DOL's final view of that question.  Id.

Given this context, it is notable that the accompanying agency commentary says not a word about either the need for "uniform" compensation or the elimination of recordkeeping burdens.  See id. at 34,632-33.  Once the USIA had decided to defer to the DOL's final determination that au pair participants had to be treated as "employees" under the FLSA, it would appear, the USIA's only interest was in obliging sponsors to ensure that au pair participants got at least what protection they would be due under the FLSA, whatever its "requirements" were.  Id.  But that federal interest may be fully accomplished by merely setting a FLSA-pegged weekly compensation floor that sponsors must require that host families meet --- and a floor that could vary based on the itemized deductions, if backed by supporting records, that a given host family might claim for room and board costs.  The fulfillment of that federal interest would not require the agency to make that floor also do double duty as a ceiling that no state could exceed in setting the obligations of host families, as a

species of employer, with respect to those whom they employed to provide in-home childcare services.

Nor is there anything anomalous about concluding that the USIA had no interest in making that floor do such double duty. As discussed above, it is not clear whether the USIA was even aware that any state law measures protecting the wage and hour rights of domestic workers existed. See supra Section III.B.3.a. A federal agency would have acted quite sensibly, therefore, in obliging sponsors of this type of exchange visitor program to be responsible for requiring compliance only with clearly established federal statutory wage and hour standards, while leaving the employer-host-families responsible for ensuring that they complied with any generally applicable state wage and hour law requirements that might emerge. Thus, contrary to the plaintiffs' contention, the fact that there is no history of federal agency attempts to oblige sponsors to require host family compliance with state wage and hour laws hardly supplies a supportable basis for concluding that the agency must have intended to preempt the participants themselves from enforcing such state law measures against their host families.

## c.

The plaintiffs separately point to what they claimed would be the adverse practical impact on the Au Pair Program of the application of the state law measures to host families. The

plaintiffs contend that, if those measures were applicable to host families as the employers of au pair participants, then the enforcement of those measures would make participation in the program for host families so costly that it would preclude "many, and probably most" families from doing so. The plaintiffs also contend that such application of the Massachusetts measures would formalize what they portray as a more informal host-family-au pair participant relationship in ways that the federal government could not possibly have intended.

This line of argument rests in part on the disputed claim that, under Massachusetts law, domestic workers must be compensated for sleep and meal periods even if they are completely relieved of job duties and free to leave the premises. See 940 Mass. Code Regs. 32.02 (defining "working time"). But, we have no reason here to disregard the Attorney General's assertion about the proper construction of state law, given the lack of clarity in the relevant provisions. See Amerijet Int'l, Inc. v. Miami-Dade Cty., 627 F. App'x 744, 749 (11th Cir. 2015) ("In evaluating the [Appellant's] facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it." (alteration in original)(quoting Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 131 (1992))).

Moreover, the plaintiffs' assertions that the Massachusetts measures would preclude large numbers of families from participating in the Au Pair Program are cast in conspicuously speculative terms ("many, probably most"). (Emphasis added). The Massachusetts wage and hours measures are generally applicable to domestic workers, whether they participate in the au pair exchange program or not. The plaintiffs' complaint provides no basis for surmising, however, that families who otherwise would have become host families in order to obtain needed in-home childcare services would opt in large numbers to forgo obtaining such services altogether in order to avoid the costs imposed by the DWBORA and the Massachusetts Fair Wage Law. Yet, if such families would not opt to forgo all such services, then the plaintiffs have failed to explain why those families would opt out of the Au Pair Program, for there is simply no way for such families to obtain such services from anyone -- au pair participants or not -- in Massachusetts without incurring the costs imposed by the DWBORA and the Massachusetts Fair Wage Law.

The plaintiffs' assertions about the impact of the administrative burdens and recordkeeping obligations imposed by the Massachusetts measures suffer from similar problems. The assertions do not, for example, take account of the fact that similar (though not identical) burdens and recordkeeping requirements are already imposed by the FLSA on host families.

- 67 -

Compare 29 C.F.R. §§ 552.100, 552.110, with Mass Gen. Laws ch. 151, § 15, and Mass Gen. Laws ch. 149, § 190(l). But see Mass. Gen. Laws ch. 149 § 190(l)(v)-(ix) (requiring that host families keep records of various employment policies, such as job responsibilities and procedures regarding termination). The assertions thus fail to show why the differential recordkeeping burdens would be so transformative as to require the conclusion that they would prevent the Au Pair Program from serving its goal of promoting international cultural exchange.

This impact-based line of argument, however, ultimately suffers from a more serious flaw, which we conclude is determinative. In asking us to infer a ceiling-setting agency intent on the basis of only speculative predictions about the future effects on host family participation of the application of state laws, the plaintiffs are necessarily asking us to engage in precisely the sort of "freewheeling judicial inquiry" into the intention of the federal agency that we are supposed to avoid in evaluating an obstacle preemption claim. Whiting, 563 U.S. at 607; see Boyle, 487 U.S. at 507 n.3 (requiring at least evidence of a "significant conflict"). This is not a case, we emphasize, in which there is an extensive regulatory history replete with agency commentary that provides support for drawing the inference that the agency had deliberately intended to set both a floor with which the private actors would have to comply and a ceiling on the

additional regulatory burdens that a state could impose on them. Compare Geier, 529 U.S. at 875-78, 885-86, with id. at 910-11 (Stevens, J., dissenting) ("[T]he Court identifies no case in which we have upheld a regulatory claim of frustration-of-purposes implied conflict pre-emption based on nothing more than an ex post administrative litigating position and inferences from regulatory history and final commentary." (second emphasis added)). Rather, neither the text nor the regulatory history affirmatively indicates that the federal government made such a deliberate, ceiling-setting choice, and, other provisions indicate the opposite. In such circumstance, speculation about future impacts supplied by the plaintiffs themselves cannot satisfy their burden to show the requisite -- implicit -- preemptive intent.

**IV.**

We recognize that the DOS, as reflected in its amicus filing, reads its current regulations -- as well as the regulatory history that we have just reviewed -- differently than we do. We thus consider the contentions that the DOS makes, too. Geier, 529 U.S. at 883; Williamson, 562 U.S. at 335-36; see also Kisor v. Wilkie, 139 S. Ct. 2400, 2418 n.6 (2019) (reaffirming courts' ability to defer to "agency interpretations advanced for the first time in legal briefs" where there is "no reason to suspect that the interpretation [did] not reflect the agency's fair and

- 69 -

considered judgment on the matter in question" (quoting Auer v. Robbins, 519 U.S. 452, 462 (1997))).

In doing so, however, we are mindful that we may not defer to an "agency's conclusion that state law is preempted." Wyeth, 555 U.S. at 576. Instead, we must attend to the "thoroughness, consistency, and persuasiveness" of the agency's explanation of how state law affects the federal regulatory scheme that the agency administers. Id. at 577. And here, as we will explain, the DOS's explanation, even if not in conflict with any previously articulated and well-considered DOS explanation, fails to warrant a finding of either field or obstacle preemption.

Like the plaintiffs, the DOS points to the fact that the "Exchange Visitor Program" regulations for certain other exchange visitor programs, unlike those for the Au Pair Program, explicitly reference state and local minimum wage laws. See 22 C.F.R. § 62.32(i)(1)(i). The DOS contends that this aspect of the regulations shows that when the DOS "intends to require payment in accordance with state and local law for [other exchange visitor program] participants the Department say[s] so expressly[.]" But, as we have noted, by terms, the "Exchange Visitor Program" regulations address only the obligations that sponsors must meet in order to avoid the sanctions that the DOS may impose on them under the regulations. The regulations do not, by terms, purport to define the obligations of the employers themselves that those

whom they employ may enforce against them. See supra Section III.A.2.

The DOS does not attempt to account for this disjuncture between the Au Pair Program's focus on the obligations of sponsors and the state wage and hour measures' focus on the obligations of the employers to the domestic workers whom they employ. The DOS merely asserts that, because sponsors of au pair exchange programs are not required to ensure that employers comply with state wage and hour laws, while the sponsors of other exchange visitor programs are so required, the participants in au pair exchange programs may not independently ensure that their employers do comply with those state laws. There is no indication, however, that the participants in those other exchange visitor programs would be prevented from enforcing their state law wage and hour rights against their employers unless the sponsors of those programs were required to show that the employers of those participants complied with them. The DOS thus fails to provide a persuasive explanation for drawing the negative inference that, because au pair exchange programs are not required to ensure such compliance, au pair participants may not enforce state wage and hour rights against their employers.

The DOS also asserts that the federal obligations on sponsors to require that au pairs are paid "in conformance with the requirements of the FLSA" based on the au pair having worked

45 hours in a week should be understood to be a preemptive ceiling on what the au pair participant may claim as a wage from her host family.  But, as we have explained, that language simply does not by terms establish such a ceiling.  See supra Section III.B.2.

The DOS separately contends that the regulations that govern the Au Pair Program should be construed to be preemptive in the same way that the federal statute that authorized the President of the United States to impose sanctions on Burma that was at issue in Crosby v. National Foreign Trade Council, 530 U.S. 363, 380 (2000), was construed to be.  The DOS contends that the regulations, like the federal Act in Crosby, are "drawn not only to bar what they prohibit but to allow what they permit."  Id.  But, in Crosby, as the Court expressly recognized, Congress's purpose was clear -- to give the President full discretion in regard to trade with "Burma."  Id. at 374-76.  It is not similarly clear that, in setting the compensation obligation of a sponsor of an au pair exchange program -- enforceable only by the DOS against that sponsor -- the regulatory scheme's purpose was to set not only the minimum amount that the sponsor must ensure that au pair participants must receive but also a ceiling on what a state may require a host family to pay that au pair participant.  In fact, the wages and hours obligation that the DOS imposes on sponsors is pegged to the requirements of a federal statute that itself makes clear that the floor that it sets for the wage that employers must

pay is not also a ceiling on what states may require them to pay. See 29 U.S.C. § 218.

Turning to the DOS's discussion of the regulatory history, the DOS points only to the very same passages in the agency commentary that we have already reviewed. The DOS does not purport to examine the context within which the passages appear. Instead, it seizes on certain phrases in isolation. As we have explained, though, considered in context, the passages that the DOS invokes show that the agency intended to establish a uniform rather than variable compensation floor -- pegged to the FLSA minimum -- that sponsors would be obliged to ensure was met. See supra Section III.B.3.a. The agency interest in ensuring that kind of uniformity, however, accords with the agency having merely established a floor for sponsors to meet. The DOS thus fails to explain why these references affirmatively indicate that the agency also had the requisite ceiling-setting intent.

There is, moreover, regulatory text that appears to point directly against the DOS's view. Specifically, DOS appears to acknowledge that the au pair regulations include an "employment component," and that the general "Exchange Visitor Program" regulations' requirement that sponsors who "work with programs with an employment component" must have "Responsible Officers" who have "a detailed knowledge of federal, state, and local laws

- 73 -

pertaining to employment" applies to the Au Pair Program.  See 22 C.F.R. § 62.11(a).

To respond to this seemingly problematic language, the DOS contends that state wage and hour laws only apply to "Exchange Visitor Programs" that have additional, specific regulations regarding state laws on top of the general regulations, such as the summer work-travel program.  According to the DOS's construction of the regulations, the general "Exchange Visitor Program" regulations' requirement that sponsors have "Responsible Officers" who understand all state laws that are relevant to their programs applies to the Au Pair Program only "with respect to matters" beyond wage and hour laws, such as state negligence laws. But, insofar as this assertion by the DOS depends on our granting the negative inference that the plaintiffs ask us to draw from the requirement that sponsors of other exchange visitor program ensure that employers of the participants in those programs do comply with such laws, we have already explained why such an inference is unwarranted.  See supra Section III.B.2.  And, insofar as this assertion does not depend on that premise, it cannot be squared with the plain text of the regulations, for reasons that we have already explained.  See id.

Thus, while we do owe respectful deference to the DOS's own view of its regulations, the portions of the regulatory text and the passages in the underlying regulatory history that the DOS

invokes to support the assertions that it makes about them simply do not support those assertions. And, of course, an agency's mere "conclusion that state law is pre-empted" is not one to which we may defer. Wyeth, 555 U.S. at 576-77.

There is one last set of materials to which the DOS -- and, in passing, the plaintiffs -- point: a series of agency guidance documents and fact sheets concerning changes to the federal minimum wage that were issued by the USIA and the DOS between 1997 and 2007. The DOS does not contend that we owe such material any deference. But, the DOS does contend that these materials show that the Au Pair Program regulations were long understood by the agency itself to oust state minimum wage laws. We do not agree.

The 1997 agency documents merely clarify that federal changes to minimum wage laws affect the stipend and wage calculated in the 1995 regulations. Thus, these guidance documents serve only to reinforce the conclusion -- already evident from the text -- that the DOS regulations apply only to sponsoring organizations and that Au Pair Program participants' actual entitlement to wages that they may enforce against their host families comes from the FLSA -- not the DOS regulations. In particular, the documents warn host families that if they fail to "abide by the . . . au pair stipend increases" they are "in violation of federally-mandated minimum wage law," not DOS regulations. These documents

thus show, at most, that state wage and hour laws were not considered, not that they were considered and preempted.

The 2007 fact sheet does refer to a fixed-dollar amount for the minimum weekly compensation in explaining the impact of the raised federal minimum wage on the Au Pair Program. That is so even though the au pair exchange program regulations would appear to permit that minimum to vary based on the actual costs host families incurred. Relying on this apparent discrepancy, the DOS and the plaintiffs -- though, again, only in passing -- argue that these guidance documents indicate that the agency had imposed a national, uniform system for au pair compensation.

But, the 2007 guidance is itself directed only at sponsors. At most, it would suggest that sponsors were obliged to enforce a weekly amount of compensation that was higher than what the FLSA and its regulations would require that the au pair participants be paid. We thus do not see how that one guidance document, insofar as it even comports with the text of the DOS regulations themselves, could supply the basis for inferring an intent from the Au Pair Program to transform the non-preemptive FLSA floor on the wage and hour rights that au pair participants have vis-a-vis their host family employers into a preemptive federal ceiling on those rights.

In fact, if we are considering past agency practice, the DOS acknowledges that, when litigation first arose to enforce a

state wage and hour measure for the benefit of au pair participants in 2015, a DOS spokesperson publicly stated that au pair exchange program sponsors must "comply with all other applicable federal, state, and local laws, including any state minimum wage requirements."  Lydia DePillis, <u>Au Pairs Provide Cheap Child Care. Maybe Illegally Cheap.</u>, Wash. Post, Mar. 20, 2015.  With regard to communicating these requirements to au pair sponsor agencies, moreover, the DOS spokesman went on to say: "The Department has been communicating with au pair sponsors to confirm that they are aware of their obligations under the regulations -- including with respect to host family requirements -- and will continue to do so."  <u>Id.</u>[17]

        We recognize that the DOS asserts that it is not "clear" that the agency's public response at that time represented a considered view.  We do not suggest otherwise.  But, insofar as the agency means to invoke other aspects of its past practice that it concedes do not represent the kind of considered agency view

_____

        [17] Although a 2014 version of a State Department informational pamphlet, the Wilberforce Pamphlet, stated that all recipients of nonimmigrant visas "have the right to be paid the higher amount" of the federal or state minimum wages, the State Department took out that statement when it revised the pamphlet in 2016. <u>Compare</u> U.S. Dep't of State, 2014 Wilberforce Pamphlet 7 (2014), https://internationalservices.ncsu.edu/files/2015/03 /Wilberforce-Pamphlet.pdf, <u>with</u> U.S. Dep't of State, 2016 Wilberforce Pamphlet (2016), https://j1visa.state.gov/wp-content/uploads/2017/01/Wilberforce_Pamphlet_October2016.pdf.

that merits deference to demonstrate how unthinkable it has always been that the Au Pair Program could function if state wage and hours laws could be enforced against host families, this aspect of the agency's past history at least suggests that the supposedly unthinkable was thought.

The regulatory history does suggest that the au pair exchange program regulations were promulgated at a time when it may not have been evident that there were independently enforceable wage and hour protections for domestic workers beyond those established by the FLSA itself.  See supra Section III.B.3.a. State laws providing such protections are never mentioned by the agency.  But, the fact that the agency may not have had those state laws in view does not permit us to conclude that the agency must therefore have preempted them, at least given the sponsor-targeting, floor-setting words that the agency chose to use in the regulations and what the history underlying those words reveals about the agency's focus.  For, while we may assume that the DOS would be free to preempt such state laws now by revising the regulations, it may not simply ascribe to them, retrospectively, a ceiling-setting character that neither the text, nor the regulatory history, nor even past practice demonstrates that they have had.

We come, then, to the plaintiffs' fallback grounds for challenging the District Court's ruling. They contend that, insofar as we find the Massachusetts state laws not to be preempted, the District Court erred in denying their motion under Rule 59(e) for reconsideration of the District Court's decision on the motion to dismiss or, in the alternative, for leave to amend their complaint pursuant to Rule 15(a). We review denials of both motions for abuse of discretion. United States ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 127 (1st Cir. 2013). We find none.

The plaintiffs can succeed on a Rule 59(e) motion for reconsideration -- relief for which, we have noted, is "granted sparingly," -- only if they can show that "the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations." Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014) (internal quotations omitted). Starting with the first of the motions, we note that the plaintiffs premised it on the availability of what they deemed "new evidence," which included, among other things, an affidavit from Stanley Colvin, a former DOS official, and letters from current members of Congress.

The plaintiffs contend that, in rejecting the motion, it was "unreasonable" for the District Court to decline to consider

the Colvin affidavit, host family declarations, and letters from members of Congress, because of the "persuasive information" that they contained. The plaintiffs further contend that the District Court abused its discretion in failing to do so because it "declined to consider documents outside the pleadings in ruling on" the motion to dismiss pursuant to Rule 12(b)(6) and relied on this rationale for denying the motion for reconsideration. As the plaintiffs put it, the District Court abused its discretion in this regard because it made this decision "without even reviewing [the Colvin affidavit] . . . even though the District Court had previously suggested at an earlier status conference that the parties could agree to submit additional facts outside the Complaint, and even though the District Court did consider other materials outside the pleadings in its decision."

The District Court did consider a congressionally commissioned report from the GAO that the Attorney General cited, but which was not in the record, in deciding the motion to dismiss. But, that document, as the District Court noted, is publicly available and the plaintiffs did not object to its inclusion. The documents at issue in this challenge, by contrast, were not publicly available, and the Attorney General did object to their consideration and thus did not agree to their submission.

The plaintiffs' arguments concerning the denial of their request to amend their complaint pursuant to Rule 15(a) are

similarly unavailing. Under that Rule, District Courts "freely give leave [to amend the complaint] when justice so requires." Fed. R. Civ. P. 15(a). But, as we have explained, "once [a] judgment has been entered, the district court is without power to entertain any amendments unless the judgment is set aside." Deka Int'l S.A. v. Genzyme Corp. (In re Genzyme Corp. Secs. Litig.), 754 F.3d 31, 46 (1st Cir. 2014). And here, judgment was entered prior to the plaintiffs' motion to amend and, thus, the District Court denied that motion on that basis.

The plaintiffs do contend that the District Court abused its discretion in denying this motion for leave to amend by relying on our decision in Fisher v. Kadant, 589 F.3d 505, 509 (1st Cir. 2009), because there "the plaintiffs had two months between the order on the motion to dismiss and entry of judgment." But, Fisher did not rely on the time between the order on the motion to dismiss and the entry of judgment in reaching its conclusion. See id. at 509-14. And, the plaintiffs do not grapple with a series of other cases applying Rule 15(a) also without regard for the time between the order on the motion to dismiss and the entry of judgment. See, e.g., In re Genzyme, 754 F.3d at 46; Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 538 (1st Cir. 2011). Thus, we see no abuse of discretion by the District Court on this score either.

## VI.

The judgment of the District Court is **affirmed**.